Frank H. Ayres & Son v. Commissioner.
Frank H. Ayres & Son v. Commissioner
Docket No. 37033.
United States Tax Court
T.C. Memo 1954-172; 1954 Tax Ct. Memo LEXIS 76; 13 T.C.M. (CCH) 952; T.C.M. (RIA) 54278; October 12, 1954, Filed *76 Held: That petitioner did not accumulate its surplus or profits beyond the reasonable needs of its business, and, accordingly, is not liable for additional surtax under section 102, I.R.C.
Raymond R. Hails, Esq., 412 West Sixth Street, Los Angeles, Calif., and M. B. Hunt, Esq., for the petitioner. Clayton J. Burrell, Esq., for the respondent. *77 BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax of the petitioner, as follows: Fiscal Year Ended
Deficiency
June 30, 1948
$11,277.07
June 30, 1949
1,227.81
June 30, 1950
17,556.68
The question for decision is whether the petitioner was formed or availed of during any of the taxable years ended June 30, 1948, June 30, 1949, and June 30, 1950, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed within the meaning of section 102 of the Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Other facts are found from the evidence. The petitioner is a California corporation with its principal office in Los Angeles, California. It kept its books and filed its income tax returns on the basis of the fiscal year ended June 30 and upon the cash method of accounting. The returns for the period here involved were filed with the collector of internal revenue for the sixth district of California. *78 Petitioner was formed to carry on a real estate business on April 22, 1946, with an authorized capital of $100,000, represented by 10,000 shares of common stock, par value $10 per share. At the time of its organization 666 shares were purchased at par by Donald B. Ayres, and 334 shares were purchased at par by Frank H. Ayres. During the period from April 22, 1946 to June 30, 1950, no additional shares were issued, and there was no transfer of the original issue of 1,000 shares. The following schedule shows for each year in question the taxable net income reported, the dividends declared or paid, the accumulated surplus, and the salaries paid to the two stockholders, who received for their services as officers one-half of the net income before taxes in the same ratio as their stock holdings. Taxable Year
Net Income
Salaries
Surplus
Dividend
June 30, 1948
$61,592.69
$61,870.89
$ 95,179.00
None
June 30, 1949
27,870.00
27,870.00
99,643.77
None
June 30, 1950
70,844.37
70,844.37
163,486.25
None
After petitioner's organization, the board of directors consisted of two stockholders, Frank H. Ayres and his son, Donald B. Ayres, and the counsel *79 for the corporation. Following the death of Frank H. Ayres in December 1950, he was replaced on the board by the son-in-law of Donald B. Ayres. Prior to April 22, 1946, the business had been carried on from 1904 to 1927 by Frank H. Ayres, as an individual, and from 1927 to approximately June 1, 1946, by Frank H. Ayres & Son, a co-partnership, in which Donald B. Ayres owned a two-thirds interest and Frank H. Ayres a one-third interest. Petitioner's business was of a nature that the services rendered and activities undertaken had to be geared to the eexigencies of the real estate market; however, a major part of the business consisted in acting as agent for landowners in the development of their vacant lots into subdivided property. As a subdivider, petitioner had to expend considerable sums of money for advertising and selling expenses before getting any return on its projects. The normal cycle for developing a parcel of land into subdivision property consumes a period of two to three years. It takes at least one year from the time the project is begun to complete the engineering and clearance of the plans with the various government agencies concerned to a point where the actual *80 physical work of subdividing can begin. Another year or two is then consumed in making the physical improvement and doing the actual selling of lots before any substantial return of invested capital occurs. The factors leading up to the formation of petitioner were essentially twofold. (1) Just prior to April 1946 the principal activity of the partnership, Frank H. Ayres & Son, consisted of acting as exclusive agent for landowners in the subdivision development of certain vacant land, known as Kentwood and Westchester, and the sale of the subdivided property. Kentwood consisted of 940 acres and the partnership had a contract to act as exclusive agent for the development and sale of 400 of those acres; but, beyond that contract it had no assurance of being allowed to develop or sell any more land in that area. (2) In April 1946 the end of the 400 acre project was in sight. No new engagements to act as exclusive agent for development and sale of subdivision properties of other landowners had been secured, and the prospect of getting such engagements was dim. This situation arose out of a government policy, developed during the war, which allowed builders to borrow 90 or 95 per cent *81 of the cost of land and buildings. With this method of financing more and more builders were able to buy directly from the landowners, subdivide the land, build homes and completely eliminate the use of subdividers such as petitioner. The partnership management realized that if the company was to continue developing property it would have to purchase the land itself. The intrusion of the builder into the subdivision business made it difficult for non-building subdividers to purchase undeveloped land which was of such a nature and so priced as to permit profitable development. The prospect that the purchase of land as a partnership would increase the possibility of large personal liability plus the realization that Frank H. Ayres was advancing in years and the consequent desire to see the business continued led the partners to form petitioner. Tax counsel had been consulted as to the probable effect tax-wise of incorporation on the partners, but he had been unable to determine in advance what the effect would be. Between 1946 and 1948 petitioner's business grew from a small corporation with about $14,000 in assets to a concern of $114,000 in assets on June 30, 1948. In 1948 Frank *82 H. Ayres and Donald B. Ayres determined that at least a fund of $100,000 per year was needed to handle the normal working capital needs of petitioner. Land and improvement prices had increased since 1946, expenses, exclusive of commissions paid to salesmen and officers' salaries, averaged from $4,400 to $5,100 per month for the next three fiscal years and there was the frequent need for large sums of immediately available cash to meet potential real estate deals. The amounts of the net working capital (adjusted) for the three fiscal years under review were as follows: Fiscal year ended
June 30
June 30
June 30
1948
1949
1950
Total current assets
$84,939.01
$107,295.23
$133,274.06
Total current liabilities
9,173.22
4,451.42
12,566.76
Net working capital
$75,765.79
$102,843.81
$120,707.30
Federal income tax payable
23,405.23
7,001.89
26,920.86
Net working capital (adjusted)
$52,360.56
$ 95,841.92
$ 93,786.44
Near the close of each of the three years in question the board of directors considered the advisability of paying a dividend. In each case it was decided that the payment of dividends would be unwise and contrary to sound *83 business policy. At the May 24, 1948 board of directors' meeting the directors considered the fact that petitioner had made an offer in April 1948 to the Palos Verdes Corporation to purchase 33 acres at Abalone Cove for the price of $50,000. Petitioner's management estimated that should the offer be accepted $75,000 would be required to make the subdivision improvements. Subsequent to this directors' meeting the offer was rejected and the Palos Verdes Corporation subdivided the property itself at a cost of $92,645.38. Between May 24, 1948 and the next board meeting on May 4, 1949, petitioner's average monthly income had fallen below that of the previous year. The average monthly income for the 1948 and 1949 fiscal years was as follows: Total
Total
Month
Commissions
Month
Commissions
1947
1948
July
$ 11,275.50
July
$ 24,833.12
August
36,789.91
August
6,991.54
September
39,512.50
September
14,906.30
October
12,518.14
October
15,059.00
November
30,380.07
November
20,293.70
December
25,368.12
December
30,917.97
1948
1949
January
$35,671.86
January
$15,038.40
February
25,377.00
February
6,041.71
March
62,689.00
March
28,066.84
April
12,847.00
April
13,839.43
May
38,146.75
May
8,731.77
June
8,827.25
June
13,934.82
Journal Entry
Dec. 1948 Extra
10,560.00
Total
$339,403.10
Total
$209,214.60
*84 During the same period petitioner had completed its activities as exclusive agent for landowners in the Kentwood and Westchester areas with respect to the 400 acres for which it had a written contract. The principal source of income at that time was from subdividing the Kentwood and Westchester properties for which it had no contract. There was no assurance that petitioner would be allowed to continue as agent for the landowners, except a verbal agreement that it would be allowed to complete the particular tract it might be operating on at any given time should the owner dispose of the remaining property by means other than through the agency of petitioner. At this time the Hughes Aircraft Co. was trying to buy up all unsubdivided Kentwood and Westchester acreage and petitioner's management was fearful that these attempts would be successful. Petitioner continually sought to purchase property to subdivide in the period from May 4, 1949 to June 16, 1950, the date of the next board meeting. It succeeded in purchasing a 47 per cent interest in a 75 acre tract of land in La Crescenta, California. At the June board meeting it was pointed out that it was the intent of the management to *85 join with the owner of the remaining 53 per cent of the property and subdivide it at a cost of $100,000 to petitioner. The net working capital at the date of the meeting was $96,150. Petitioner made no loans to its shareholders or their relatives and did not invest in any assets not connected with its business. At no time during the period in issue were the earnings or profits of petitioner permitted to accumulate beyond the reasonable needs of its business. Petitioner was not formed, and at no time during the period under review was it availed of for the purpose of preventing the imposition of surtax on its shareholders by permitting earnings or profits to accumulate instead of being divided or distributed. Opinion The respondent contends that petitioner was formed and availed of during the taxable years ended June 30, 1948, June 30, 1949, and June 30, 1950, for the purpose of preventing the imposition of surtaxes upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. He has accordingly determined a deficiency as provided by section 102(a), [1] Internal Revenue Code of 1939. *86 Under section 102(c), if petitioner's earnings or profits were permitted to "accumulate beyond the reasonable needs of the business," that fact is determinative of the purpose, to prevent the imposition of the surtax upon the shareholders, unless the petitioner proves to the contrary by a clear preponderance of the evidence. See Eastern Ry. & Lumber Co., 12 T.C. 869; Whitney Chain & Mfg. Co., 3 T.C. 1109, affd. 149 Fed. (2d) 936. What are the reasonable or unreasonable needs of a business is a question of fact. Trico Products Corp. v. McGowan, 67 Fed. Supp. 311, affd. 169 Fed. (2d) 343, certiorari denied 335 U.S. 899, rehearing denied 335 U.S. 913; Dill Mfg. Co. 39 B.T.A. 1023. There is no set standard of measurement. Prominent factors in one case may become minor in another. Universal Steel Co., 5 T.C. 627. "Whether or not earnings have been retained for the purpose of evading taxes on the stockholders is a question of intent, and each case must of necessity be decided upon facts and circumstances in that case. There is no rule of thumb or yardstick by which *87 this question of intent can be decided. The court must look at the matter from the viewpoint of the officers of the corporation, and place himself in the position they occupied at the time, take into consideration all of the facts and circumstances then existing and say what the officers intended at the time, * * *" Gazette Publishing Co. v. Self, 103 Fed. Supp. 779, 782. We think petitioner has met its burden of proof. Upon the evidence received at the hearing, we have found as ultimate facts that during the taxable years in question petitioner did not permit its earnings or profits to accumulate beyond the reasonable needs of its business. Petitioner was an operating company, engaged in a highly competitive and fluctuating business. Its officers and directors were men experienced in real estate business. As a result of the growth of petitioner's business and the rising price level its management decided in 1948 that at least $100,000 per year would be required to meet the normal working capital requirements of fixed monthly expenses and large sums of immediately available cash for potential real estate deals. In addition to the general needs for working capital *88 there was the realization that petitioner's income from activities as exclusive agent for the subdividing landowners in the Kentwood and Westchester areas might be cut off in the near future. The operation on the 400 acre portion for which petitioner had a contract, ended during the 1949 fiscal year. After completion of the 400 acre tract the termination of petitioner's activities in and the income from the Kentwood and Westchester projects were at all times at the will of the landowners. Since commissions from the Kentwood and Westchester projects represented the major portion of petitioner's income, provision for a source of replacing those commissions in the event of termination represented a very urgent need, even during the fiscal year ended June 30, 1948. Especially is this true since income from any new project would not be realized for at least one year and possibly as much as three years after commencement. This necessitated the anticipating from one to three years in advance the need for property to sell. Otherwise petitioner would be faced with a period in which it was developing property but had none to sell. The record shows that the possibility of replacing the Kentwood *89 and Westchester projects with similar ones was not bright. With the advent of the builders into the subdividing business, non-building subdividers such as petitioner were being bypassed. To stay in the subdividing business petitioner was forced to purchase land on its own account and then subdivide it, necessitating a larger investment than previously required. At the board of directors' meeting for each of the years under review the possibility of paying dividends was considered. The considerations which led the directors to determine that the payment of a dividend would be contrary to sound business policy were set out in the record in detail. At the 1948 meeting the directors considered the outstanding offer to the Palos Verdes Corporation for the purchase of 33 acres of land for $50,000. Those in charge had estimated that $75,000 would be needed for the cost of improvements should the offer be accepted. (After the offer was rejected the actual cost to the Palos Verdes Corporation was $92,645.38). Facing a potential expenditure of $125,000 the board concluded that dividends should not be paid. At that time the net working capital could not have differed materially from the $52,350.56 *90 of net working capital as of June 30, 1948. In 1949 the directors reviewed a year that had shown a marked reduction in monthly income over the previous year and the attempt of Hughes Aircraft Co. to purchase all unsubdivided Kentwood and Westchester property. At that time petitioner had no written contract for development in that area. It was operating under a verbal agreement as to each small parcel it developed. Prior to the 1950 meeting petitioner had purchased a 47 per cent interest in a tract of land in La Crescenta, California, and was expecting to spend $100,000 in its development. At the date of the meeting the net working capital was $96,150, a sum hardly sufficient to pay dividends, normal expenses, and the La Crescenta improvement costs. Respondent urges that there must be an immediate need for the accumulation, citing Eastern Ry. & Lumber Co., supra; Trico Products Corp. v. McGowan, supra; McCutchin Drilling Co. v. Commissioner, 143 Fed. (2d) 480; KOMA, Inc. v. Commissioner, 189 Fed. (2d) 390. A review of these cases leads to the conclusion that "immediate need" is a label used in cases where there was an unreasonable *91 accumulation of earnings either because the need or plan of the corporation was so vague, tentative or indefinite that it did not justify the accumulation or that for some reason the contemplated expenditures could not be made during the period under review or in the ascertainable future. In the instant case the intention of petitioner was not to purchase land at some indefinite future date. Cf. World Publishing Co. v. United States, 169 Fed. (2d) 186, 189. It had a definite plan to replace the eventual loss (by completion or termination of the agency) of the Kentwood and Westchester projects, as evidenced by the Palos Verdes offer, the continuing search for profitable land during 1949 and 1950, and the purchase of the La Crescenta tract. The fact that at all times during the years in question petitioner remained as exclusive agent for the Kentwood and Westchester landowners is of no consequence. It was necessary that it find new property to develop while it was completing existing projects because of the time lag between investment and return. It is true that the intrusion of the builders into the subdividing business made undeveloped property scarce but some profitable *92 property was always available. Cf. Universal Steel Co., supra. Respondent also contends that since the Ayers were sole owners of the corporation the business would have been as well protected against unexpected demands for capital by distribution of its earnings to them as by the accumulation of its profits. This is completely fallacious. Respondent does not consider that the earnings if distributed would be diminished by an income tax on dividends and that there is no assurance that the net amount distributed would be retained by the shareholder, as it could voluntarily be expended or be reached by his personal creditors. The adoption of respondent's position would mean that no closely held corporation could ever accumulate any earnings, however reasonable the need. Having found that the accumulation was not unreasonable, it follows that petitioner was not formed or availed of for the prohibited purpose. Decision will be entered for the petitioner. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 38 1/2 per centum of the undistributed section 102↩ net income in excess of $100,000.